**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

|  |  |  |
|---|---|---|
| **IMAN PHARMACY, INC.** | : | Case No. 4:26-cv-00630 |
| *(d/b/a Fleetwood Specialty Pharmacy)* | : | |
| | : | **COMPLAINT** |
| Plaintiff | : | |
| | : | |
| | : | |
| **EXPRESS SCRIPTS, INC.** | : | ***JURY TRIAL DEMANDED*** |
| | : | |
| Respondent | : | |
| | : | |

**COMPLAINT**

Plaintiff **IMAN PHARMACY, INC.** *(d/b/a Fleetwood Specialty Pharmacy)* files its complaint for breach of contract against and other related claims, **Defendant Express Scripts, Inc.** and alleges as follows:

## I.     NATURE OF CLAIMS

1. Plaintiff Iman Pharmacy, Inc., *(d/b/a Fleetwood Specialty Pharmacy2)* is a New York corporation with its principal place of business located at 505 Gramatan Ave., Mt. Vernon, NY 10552. Plaintiff operates under the trade name "Fleetwood Specialty Pharmacy." For all relevant purposes of this Demand, Plaintiff will be referred to as "**Plaintiff Fleetwood**."

2. Plaintiff Fleetwood's contract breach claim arises out of Defendant ESI's breach of the parties' Provider Manual agreement by assessing DIR fees that are opaque, baseless and unlawful in an amount exceeding $800,000 for the period 2019 through 2024.

## II.     JURISDICTION & VENUE

3. This Court has jurisdiction by virtue of diversity jurisdiction pursuant to 28 U.S.C. 1351. Plaintiff is a New York corporation, and Defendant is a Missouri based company. Further, the parties

are bound by the choice of forum clause contained in the Provider Manual Agreement which designated the Eastern District of Missouri as the proper venue for disputes.

### III. THE PARTIES

4. Plaintiff **Iman Pharmacy, Inc.** (*d/b/a Fleetwood Specialty Pharmacy*) (Plaintiff Fleetwood) operates a retail community pharmacy located at 505 Gramatan Ave. Mt. Vernon, NY. As a retail community pharmacy, Plaintiff serves the needs of its patients with exceptional care and skill. Plaintiff is an "in-network" member of Defendant ESI.

5. Defendant **Express Scripts, Inc.** (Defendant ESI) is a Pharmacy Benefits Manager (PBM), and upon information is incorporated in Missouri and operates throughout the United States including the State of New York.

## II. Unlawful Direct and Indirect Remuneration (DIR) Fees

### Medicare & DIR Fees

6. Medicare is a federally funded health insurance program for persons aged 65 and older and persons with long-term disabilities. The Medicare prescription drug benefit, Medicare Part D ("Part D") offers outpatient prescription drug coverage to Medicare beneficiaries across the country.

7. Part D was enacted as part of the Medicare Modernization Act of 2003. Part D coverage is not provided within the traditional Medicare program. Instead, it is administered through private health plans ("Part D Sponsors" or "Plans") that contract with the federal government.

8. Part D Sponsors are often run by large health insurance companies, including Defendant ESI. The Part D Sponsors, in turn, contract with corporate intermediaries, i.e., PBMs such as Defendant ESI, to administer their prescription drug benefits.

9. In 2026, approximately 56.1 million Americans covered by Medicare were enrolled in Part D. Because Medicare recipients are prescribed more drugs on average than the population,

Medicare beneficiaries constitute an outsized percentage of prescriptions filled in the United States.

10. Defendant ESI acts as a powerful middleman in the center of the pharmaceutical industry. Defendant ESI profits at nearly every stage of the drug distribution chain from manufacturing to filling and dispensing to patients.

11. Defendant ESI acts as an intermediary between Part D Plans (including Private healthcare plans and State Medicaid plans) and pharmacies and drug manufacturers.

12. Part D Plans own or hire PBMs including ESI to negotiate drug pricing with manufacturers, and to determine the amount pharmacies will be reimbursed for dispensing.

13. Defendant ESI use a **series of rebates and fees** along the supply chain to pocket the difference between what a PBM charges health plans for prescription drugs and what they pay the pharmacy — often called the "spread."

14. Defendant ESI therefore controls every facet of the pharmaceutical filling and dispensing industry.

15. Defendant ESI decides which "in-network" pharmacies including Plaintiff Fleetwood can dispense drugs in Part D Plan networks, which drugs those pharmacies will dispense, and the prices, discounts, and other terms of sale applicable to reimbursement of pharmacies.

16. Accordingly, Plaintiff Fleetwood must now accept the increasingly anticompetitive pricing and contract terms set forth by Defendant ESI or face exclusion from its network. Not participating in Defendant ESI's network would severely limit Plaintiff Pharmacy's access to a critical mass of patients.

17. Plaintiff Fleetwood and all independent pharmacies vary in the services they provide. Typically, retail pharmacies fill and dispense prescriptions and receive reimbursement for a service referred to as "Filling and Dispensing Services."

18. Participating in other networks is not a substitute; if an independent pharmacy does not accept the anticompetitive terms from Defendant ESI, it loses the patients in Defendant ESI's network.

19. Those patients must take their prescriptions to a different pharmacy to enjoy the benefits of their Medicare Part D Plans. Further, beneficiaries do not choose Part D Plans based on DIR fees.

20. To serve the millions of beneficiaries enrolled in Defendant ESI-affiliated Plans, independent pharmacies such as Plaintiff Fleetwood generally have no practical choice but to participate in Defendant ESI's network through a Pharmacy Services Administrative Organization) PSAO which currently covers tens of thousands of pharmacies across the United States.

21. The financial reimbursement mechanics of a Medicare Part D prescription involve a multi-step transaction that begins the moment a patient receives their medication. This process dictates not only what the patient pays, but how the dispensing pharmacy is ultimately compensated—and precisely where Pharmacy Benefit Managers (PBMs) extract their fees.

    a. **The Point-of-Sale Transaction** The process begins at the pharmacy counter. When a Medicare beneficiary is dispensed a prescription drug, the beneficiary is responsible for a point-of-sale co-payment.  The patient pays this out-of-pocket amount directly to the pharmacy, which covers the first fraction of the drug's total cost.

    b. **Pharmacy Claim Adjudication and PBM Reimbursement** To recover the remaining cost of the dispensed medication, the pharmacy submits a reimbursement claim to the PBM, which administers the prescription benefits on behalf of the patient's Part D plan. The PBM does not reimburse the pharmacy for the full sticker price. Instead, it calculates the payment based on a benchmark metric—typically a discounted Average Wholesale Price (AWP) or Wholesale Acquisition Cost (WAC). Crucially, before the PBM remits payment to the pharmacy, it deducts both the patient's already-paid co-payment and its own Direct and Indirect Remuneration (DIR) fees.

c.  **Upstream Settlement with the Part D Plan and CMS** After the PBM issues the net reimbursement to the pharmacy, the transaction moves upstream. The PBM submits a claim to the patient's specific Medicare Part D plan to be made whole for the funds it just disbursed. Finally, the Part D plan submits a transaction record to the Centers for Medicare and Medicaid Services (CMS) to draw down the federal subsidy that covers the ultimate cost of the drug.

22. The Medicare statute provides that a sponsor or organization shall provide enrollees with access to negotiated prices used for payment for covered part D drugs, even if no benefits may be payable under the coverage with respect to such drugs. 42 U.S.C. § 1395w-22102(d)(1)(A).

23. The statute further states that "negotiated prices shall take into account negotiated price concessions, such as discounts or indirect subsidies, rebates, and **direct or indirect remunerations**, for covered part D drugs, and include any dispensing fees for such drugs." 42 U.S.C. § 1395w-102(d)(1)(B) (emphasis added).

**DIR Fees**

24. The concept of DIR fees was introduced by CMS, the federal agency that administers Medicare. CMS sought to increase transparency for the true price of prescription drugs and promulgated regulations to require Part D Sponsors and other entities to report to CMS all direct and indirect remuneration received for a drug—including all rebates or reimbursements received from drug manufacturers—so that CMS could base reimbursement rates to the Plans on the "true cost" of a prescription.

25. Before 2016, CMS required that the "negotiated price" for any drug—i.e., the price upon which patient cost-sharing is based at the point-of-sale—must be "reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point-of-sale." 42 C.F.R. §423.100 (2014).

26. However, effective January 1, 2016, CMS created what it intended to be a narrow exception to this rule. It excluded from the definition of negotiated price "those contingent price concessions that cannot reasonably be determined at the point-of-sale." 42 C.F.R. 423.100 (2016). CMS did not expect this change to have significant effects. But it did.

27. Upon information, Defendant ESI exploited the new regulation to unlawfully extract huge sums of money from independent pharmacies such as Plaintiff Fleetwood.

28. In 2018, CMS informed PBMs and Part D Sponsors that their manipulation of pharmacy price concessions after the point of sale is anti-competitive: "The one-sided nature of the pharmacy payment arrangements that currently exist also creates competition concerns by discouraging independent pharmacies from participating in a plan's network and thereby increasing market share for the sponsors' or PBMs' own pharmacies. Part D is a market-based approach to delivery of prescription drug benefits and relies on healthy market competition.

29. On the one hand, Defendant ESI profits from DIR fees in various ways, including by retaining them as a source of revenue. On the other hand, Defendant ESI runs mail-order pharmacies that are also home delivery specialty pharmacies. When other pharmacies fail, Defendant ESI faces less competition and can acquire existing pharmacies at a discount, if it chooses. Either way it benefits.

30. Defendant ESI's distortion and exploitation of the "DIR loophole" is unlawful in part because it delays the fees it imposes on independent pharmacies including Plaintiff Fleetwood largely without a legitimate basis.

**Defendant ESI's DIR Fees from 2019-2024 are Unlawful & Unconscionable**

31. Defendant ESI imposes minimum DIR fees on every independent pharmacy including Plaintiff Fleetwood no matter how it performs. Further, for years, Defendant ESI has imposed increasing DIR fees on Plaintiff Fleetwood based on "performance criteria" metrics, many of which - as will be shown below - make no sense for pharmacies, patients or even doctors. It appears to only benefit Defendant ESI.

32. Realizing an opportunity to extract more money from Plaintiff Fleetwood, Defendant ESI purportedly under the 2016 CMS changes, **claimed fees that "could not be calculated at the point of sale." Therefore, to date, Plaintiff Fleetwood has no way to figure out the basis for hundreds of thousands of dollars in DIR fees.**

33. Defendant ESI forces independent pharmacies such as Plaintiff Fleetwood to join "network" programs where pharmacies are assessed DIR fees, supposedly based on their performance and purportedly to encourage better performance by pharmacies.

34. Under Defendant ESI's scheme, DIR fees are not assessed until months after Plaintiff Fleetwood fills and dispenses medications because the fees supposedly rely on patient data and outcomes. Therefore, according to Defendant ESI, the hundreds of thousands of dollars in DIR fees Defendant imposed against Plaintiff cannot reasonably be determined at the point-of-sale.

35. Various attributes of Defendant ESI's DIR fees are striking. First, pharmacies are forced to pay for the opportunity to provide DIR Services or what ESI refers to as "network participation and performance-based assessments." Defendant charges independent pharmacies DIR fees in amounts that depend on how it assesses their performance on metrics such as generic dispensing rates, medication adherence, patient satisfaction surveys, and comprehensive medication review completion rates metrics that closely track the CMS Part D Star Ratings measures but are applied and scored entirely at ESI's discretion and for ESI's exclusive profit.

36. A second striking attribute of DIR fees is that Defendant coerces pharmacies to produce outcomes over which they have little or no control. Although Defendant ESI claims that its "performance criteria" are designed to measure pharmacy performance, many of them either do not or they do so poorly.

**The Medicare Star Rating System**

37. Defendant ESI's metrics for measuring pharmacy performance are loosely based on Medicare's Star Rating system, Medicare's system for rating the performance of Part D Plans. The

"performance criteria" monitor things such as adherence to certain prescription drugs, including for diabetes and high cholesterol, and formulary compliance.

38. But the Star Ratings were developed to rate health plans, not pharmacies. As a result, many of the performance criteria established by Defendant ESI make little or no sense for independent pharmacies such as Plaintiff Fleetwood.

**Plaintiff Fleetwood Has No Control Over DIR Metrics**

39. A large criteria number are outside Plaintiff Fleetwood control—dependent upon physician prescriptions or the performance of unrelated pharmacies within a network or are most heavily influenced by patient characteristics such as poverty or access to information.

40. For example, for a pharmacy to achieve a high score on statin adherence, a physician or other provider with prescriptive authority (hereinafter a physician) must continue to prescribe a statin as part of a cholesterol program.

41. But physicians may have good reasons not to do this, including if a statin is contraindicated due to drug interactions for a particular condition (such as prescription drugs treating HIV), or if the patient experienced side effects in the past, or prescribers see no value in prescribing it.

42. Moreover, prescribers often rely on hundreds of studies questioning the overall benefits of statins in diabetes patients, studies showing no meaningful reduction in cardiovascular events or even potential harm, while ESI's DIR programs ignore this evidence and selectively emphasize a handful of studies concluding that statins prevent cardiovascular events.

43. In any event, the pharmacy whose performance is purportedly being measured has little or no control over whether a physician prescribes a particular medication. Pharmacists do not have prescriptive authority and thus cannot prescribe medications and cannot control their "performance" under Defendant ESI's standards. Even if a pharmacy follows ESI's logic and encourages statin use, ESI's DIR programs mandate the drug without specifying which one is

preferred allowing ESI to retroactively charge DIR fees on any non-preferred fill, turning an evidence-based decision into a profit opportunity for ESI.

44. Other factors Defendant uses, such as formulary compliance, are not within the sole control of the pharmacy and are poorly designed to encourage better performance. Yet pharmacies are forced to pay to provide those services to be part of the network. For example, physicians may prescribe medications that are not on the formulary for a variety of reasons, such as allergies or intolerances to formulary medications, or the need for a specific medication that is not available on the formulary.

45. Yet Plaintiff is punished and forced to pay higher DIR fees even though they have little or no influence over the decision not to comply with the formulary.

46. Specifically, at one point, Defendant ESI used the following criteria to "assess performance": Renin Angiotensin System (RAS) Antagonists Adherence, Statin Adherence, Diabetes Adherence, Specialty Adherence, GAP Therapy (Statin Use in Persons with Diabetes), Comprehensive Medication Review (CMR), Completion Rate (MTM), and Formulary Compliance.

47. The purported performance standards particularly harm pharmacies that fill specialty medications, such as those treating patients with the most severe diseases, including cancer, Multiple Sclerosis, Rheumatoid Arthritis (RA) and HIV.

48. Pharmacies that fill specialty medications such as Plaintiff Fleetwood often do not dispense generic drugs or common "maintenance medications," like statins. Yet Defendant ESI still penalizes them for failing to do so.

49. Not only are many of the metrics nonsensical, but so are the ways in which Defendant ESI applies them. Application of performance metrics is at Defendant ESI's complete discretion - a discretion Defendant exercises in bad faith and is not even known to Plaintiff Fleetwood.

50. For example, Defendant ESI penalizes an independent pharmacy on adherence when a patient discontinues filling her prescriptions at the pharmacy, regardless of circumstances. The cause may be that the patient spends winters in a different part of the country and fills her prescriptions there, or the patient was told by the physician to discontinue using a drug, or the patient died, or the manufacturer has discontinued manufacturing the drug. In every one of these entirely common scenarios, the independent pharmacy has zero control over the outcome, yet ESI still penalizes and reduces the pharmacy's adherence score as an excuse to claw back money months later.

51. Most egregiously, ESI provides no meaningful channel for pharmacies to report or document these exculpatory circumstances and avoid the penalty. There is no upload portal, no exemption code, no appeals process that actually works, and no timely response when pharmacies attempt to explain via phone or email.

52. ESI simply treats every gap in refills as "poor performance" by the original pharmacy and keeps the resulting DIR fee as pure profit turning unavoidable life events, physician decisions, patient mobility, mortality, and supply-chain failures into a reliable revenue stream for itself while systematically draining the financial health of independent pharmacies.

53. Defendant ESI could assess performance so that independent Pharmacies are not penalized for these events, none of which is within pharmacy control or actually measures pharmacy performance, but it has chosen not to do so.

54. The way that Defendant ESI purports to measure performance of each pharmacy against other pharmacies is also illegitimate. Defendant ESI ranks all participating pharmacies for a Plan and then charges higher ranked pharmacies lower DIR fees and lower ranked pharmacies higher DIR fees. Thus, a pharmacy can perform very well but still be assessed high DIR fees because it did not perform as well as other pharmacies.

55. Pharmacies that cannot perform well on the criteria—such as pharmacies that fill specialty medications or pharmacies that serve medically underserved areas—will be assessed high DIR fees even if they perform well given their circumstances, including the patient population mix

that they serve. Again, independent pharmacies are often forced to pay high DIR fees based on circumstances they cannot control.

56. A third striking feature of Defendant ESI's DIR fees is their lack of transparency. For incentives to be effective, pharmacies need to know what they are, how they are doing, and how they can improve their performance. But Defendant ESI is opaque about the correlation between performance on metrics, relative performance, and the amount of DIR fees. Pharmacies often cannot predict whether actions they take will reduce the DIR fees that Defendant ESI imposes on them, undermining their efficacy as incentives.

57. A fourth striking feature of Defendant ESI's DIR fees is that they are delayed. Pharmacy assessments occur long after performance. Pharmacies thus cannot adjust their conduct in real time. That too renders the DIR fees ineffective at encouraging improved performance Defendant ESI does not report pharmacies' performance or the amount of DIR fees for many months.

58. By the time the DIR fees are assessed, so much time has passed that an Independent Pharmacy cannot meaningfully contest any factual basis for the PBM's assessed fee, if it is even able to understand why the DIR fees were assessed or what they were assessed for.

59. Further, the pharmacy's circumstances or practices may have already changed by the time they get feedback about how they performed in the past. Untimely feedback and incentives are ineffective.

60. In sum, the practical effect of the DIR fees is that Plaintiff Fleetwood is forced to pay to provide DIR Services, and the amount they pay is in large part arbitrary, unexplained, unfairly calculated, and untimely.

61. Defendant ESI's DIR determination criteria is unfair and not actuarially based. Upon information, among various other flaws, Defendant ESI often uses inappropriately small sample sizes. As a result, small variations in performance can have disproportionate negative effects. In addition, some calculations are entirely arbitrary.

62. For example, upon information, if Defendant ESI has no data for some pharmacies on a metric—including because the pharmacies have no relevant sales—it will ascribe to the pharmacies the average from other pharmacies and impose DIR fees accordingly.

63. Between 2016 and 2023, Defendant ESI imposed upon Plaintiff Fleetwood over $800,000 in DIR fees. These fees were made months after the point of sale making it very difficult for Plaintiff Fleetwood to return to each prescription to determine the validity of the DIR fees.

64. These fees were imposed retroactively often months after the point of sale making it nearly impossible for Fleetwood to verify their validity or contest them. ESI's policies set time limits for pharmacies to challenge or correct claims, yet ESI applies DIR fees long after this window closes, when patients may have already picked up prescriptions, changed insurance plans, or stopped filling at the pharmacy due to relocation, death, or physician orders. With no practical mechanism to appeal, reverse, or adjust these fees after the fact, Fleetwood is left powerless.

65. Defendant ESI never provided Plaintiff Fleetwood with the basis for each DIR fee imposed on virtually every prescription from **2016-2023**. In fact, most of the DIR fees were incurred long after the point of sale.

**DEFENDANT ESI'S UNCONSCIONABLE CONTRACT TERMS**

66. Defendant ESI imposes DIR fees and forces pharmacies to provide DIR Services at a loss through contracts that are not the subject of arms-length negotiation. Defendant ESI leverages its market power, vertical integration with Part D Plans, and access to networks of Medicare beneficiaries to impose numerous, lengthy, so called one-sided "Provider Manual Agreements" to the independent pharmacies such as Plaintiff Fleetwood as part of a "take it or leave it" package. Plaintiff is never afforded the opportunity to negotiate any terms because it risks losing access to beneficiaries.

67. The opposite is not true—Defendant ESI can steer and prefers to steer patients to its own pharmacy. Defendant ESI "contracts" consist of numerous documents, including a Provider

Agreement, the Defendant ESI Provider Manual, and numerous addenda (collectively "Defendant ESI Contract").

68. Out of all these documents, the most important document, The Provider Manual is never signed by the pharmacy. Therefore, Defendant ESI can and does frequently and unilaterally amend the Provider Manual without ever giving Plaintiff Fleetwood the chance to negotiate any new terms. Thus, if Plaintiff Fleetwood submits any claim for reimbursement to Defendant ESI after the effective date of an amendment, the pharmacy is deemed to have agreed to Defendant ESI's unilateral amendment.

69. These contracts are one-sided, creating an extraordinary imbalance in obligations. For example, under the contracts Defendant ESI at times reimburses the pharmacies for less than their cost of acquiring drugs. In other words, Defendant ESI forces pharmacies to fill prescriptions at a loss. When accounting for administrative costs and DIR fees, it can become financially crippling to fill prescriptions at below acquisition cost under the terms of the Defendant ESI contracts.

70. Defendant ESI sets the terms of its contracts with independent pharmacies. There is no meaningful opportunity to negotiate, as independent pharmacies are forced to accept inequitable terms or to lose access to millions of beneficiaries serviced by Defendant ESI and the Plans with which it works.

71. The one-sided contracts provide Defendant ESI with sole discretion to determine the methodologies for calculating DIR fees.

72. While the contracts set out purported performance measures related to DIR fees, they are silent on the details of how the final performance scores are calculated, how the final performance score relates to penalties that independent pharmacies such as Plaintiff Fleetwood must pay, how independent pharmacies are ranked in the network, and how the ranking affects DIR fees. Defendant ESI exploits this silence to its own advantage and to the detriment of Plaintiff Fleetwood.

73. Then, Defendant ESI imposes a penalty based on that average. This practice defies any reasonable expectation by Plaintiff Fleetwood. Defendant ESI claims the performance metrics as a mechanism to improve performance, when, in fact, Defendant ESI often does not measure Plaintiff Fleetwood's performance at all.

74. Defendant ESI's contract terms are not merely one-sided and oppressive. They also violate numerous state and federal laws that are set forth in the contract addenda themselves. For example, federal law requires prompt payment of "clean claims" (claims for reimbursement with no defect or impropriety) that are submitted by Plaintiff Fleetwood within 14 days after the claim has been received, or within 30 days of receiving any other claim. 42 U.S.C. §1395w-112.

75. ESI's contracts also contain state-specific provisions requiring prompt payment of clean claims. Yet pursuant to the terms of the Defendant ESI DIR fees, Plaintiff must wait (sometimes for months) to receive the final reconciliation on a claim. ESI's own contracts echo this, incorporating state-specific provisions that similarly demand prompt processing of clean claims, often within 21–45 days depending on jurisdiction.

76. Yet, in a blatant subversion of these safeguards, Defendant ESI's DIR fee regime forces Plaintiff Fleetwood to endure prolonged waits often up to months before receiving any final reconciliation or true reimbursement on those same claims.

77. Initial payments arrive within the legal window, but ESI then withholds full settlement until DIR calculations "emerge" at quarter's end or year-end retroactively clawing back funds based on opaque performance metrics assessed months or years later.

78. Plaintiff Fleetwood fronts the drugs and labor upfront, only to face surprise deductions long after patients have moved on, plans have changed, or records are inaccessible—leaving no recourse to contest or correct, turning DIR fees into a windfall.

79. By Defendant ESI's design, Plaintiff Fleetwood's claims are occasionally paid in a timely manner due to the imposition of DIR fees.

80. Defendant ESI also violates its prompt payment obligations through its minimum DIR fees that apply regardless of a pharmacy's "performance." Minimum DIR fees can be reasonably determined at the point of sale, so it violates federal and state law to impose them as retroactive penalties under the guise of "DIR." 42 C.F.R. § 423.100 (2016).

81. Defendant ESI seeks to shield its unlawful conduct from being challenged by including in its contracts with independent pharmacies a forced arbitration clause with several unconscionable terms, including:

   a.  giving Defendant ESI the power to change the terms of the clause unilaterally,
   b.  to drastically limit independent discovery,
   c.  requiring independent pharmacies to pay ESI attorney's fees and other costs if they lose and to pay half the cost of the arbitration.

**FIRST CLAIM FOR RELIEF:**
**Breach of the Provider Manual Agreement (Contract)**

82. Plaintiff Fleetwood incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

83. Defendant ESI entered into a contractual relationship with Plaintiff Fleetwood and owes it a duty to act in good faith and deal fairly.

84. The conduct of Defendant ESI described herein not only expressly breached the terms of Defendant ESI's Provider Manual but also violated the implied covenant of good faith and fair dealing, including because Defendant ESI exercised discretion and performed its contractual obligations in bad faith and in a manner that denied Plaintiff and the benefit of their bargains.

85. Such acts and omissions lead to Defendant ESI's breach of duty to deal in good faith and fairly with Plaintiff and were the actual and proximate cause of harm of no less than $800,000 in financial damages to Plaintiff.

## SECOND CAUSE OF ACTION:
### Unconscionability

86. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

87. Plaintiff seeks a declaratory judgment from this Court stating that the imposition of DIR fees was unconscionable.

## THIRD CAUSE OF ACTION:
### Unjust Enrichment

88. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein. Plaintiff conferred benefits on Defendant ESI by providing Filling and Dispensing Services and DIR Services to beneficiaries covered by Plans that Defendant ESI administers.

89. Defendant ESI benefited from those services at the expense of Plaintiff and by receiving compensation under its contracts with its Plans and otherwise. It would be unjust to allow Defendant ESI to keep the benefits of the services of Plaintiff.

## FOURTH CAUSE OF ACTION
### Quantum Meruit

90. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

91. Plaintiff conferred benefits on Defendant ESI by providing Filling and Dispensing Services and DIR Services to beneficiaries covered by Plans it administered. Defendant ESI accepted the services or materials.

92. The unconscionability of Defendant ESI's actions renders the contracts between Plaintiff and Defendant ESI unenforceable as they relate to DIR fees. Defendant ESI should be required to

pay Plaintiff the value of the DIR Services they provided in an amount of not less than $800,000.

## V. DEMAND FOR RELIEF

Plaintiff Fleetwood respectfully demands:

(a)     a judgment in the amount to be determined at trial, but not less than $800,000 for the unlawful DIR fees assessed during the period of 2019 to 2023.

(b)     Attorneys Fee's, and any other relief deems just and reasonable.

**Date: April 28, 2026**

Respectfully Submitted,

/s/ Nizar DeWood
Nizar A. DeWood, Esq.
EDMO Bar No. 24091997TX
4306 Yoakum Blvd. Suite 330
Houston, TX 77006
T. 713.492.2274
nizar@dewood-law.com
Attorney for Plaintiff Iman Pharmacy
(*d/b/a Fleetwood Specialty Pharmacy*)